

ORIGINAL

FILED IN CLERK'S OFFICE

APR 19 2004

, Clerk

Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ELAINE L. CHAO, Secretary of Labor, United States Department of Labor, | ) ) Civil Action |
| Plaintiff, | ) ) No. 1:03-CV-2581-CC |
| v. | ) ) |
| LOCAL 527-S, GRAPHIC COMMUNICATIONS UNION OF THE GRAPHIC COMMUNICATIONS INTERNATIONAL UNION, AFL-CIO-CLC, | ) ) ) ) ) |
| Defendant. | ) ) |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56(c) and LR 56.1, NDGa., Plaintiff Elaine L. Chao, the Secretary of Labor, hereby moves this Court for Summary Judgment, and asks that the Court declare the Defendant's December 2002 election void and order a new election under Plaintiff's supervision. In support of this motion, Plaintiff submits a Memorandum of Law, Statement of Material Facts, and Affidavit of Norman E. Stafford.

It is undisputed that there were several procedural deficiencies in

14

Defendant's December 2002 election. Each of these deficiencies violated the

Labor-Management Reporting and Disclosure Act of 1959, and may have affected

the outcome of the election. Plaintiff therefore respectfully submits that judgment

as a matter of law in Plaintiff's favor is appropriate, and asks this Court to grant

summary judgment against Defendant.

Respectfully submitted,

HOWARD M. RADZELY
Solicitor of Labor

PETER D. KEISLER
Assistant Attorney General

BARTON E. WIDOM
Acting Associate Solicitor
 For Labor Management Laws

WILLIAM S. DUFFEY, JR.
United States Attorney

MINA RHEE
Assistant United States Attorney
Provisionally admitted 7.28.03
U.S. Attorney's Office
600 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, Georgia 30303
(404) 581-6302
Fax: (404) 581-6234

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ELAINE L. CHAO, Secretary of Labor, United States Department of Labor, | ) ) Civil Action ) |
| Plaintiff, | ) No. 1:03-CV-2581-CC |
| v. | ) ) |
| LOCAL 527-S, GRAPHIC COMMUNICATIONS UNION OF THE GRAPHIC COMMUNICATIONS INTERNATIONAL UNION, AFL-CIO-CLC, | ) ) ) ) ) ) |
| Defendant. | ) ) ) |

## PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to LR 56.1(B), NDGa, Plaintiff Secretary of Labor submits the following undisputed material facts in support of her Motion for Summary Judgment.

1. Local 527 is a local labor organization subject to the requirements of the Labor-Management Reporting and Disclosure Act of 1959, 42 U.S.C. § 482(b) ("LMRDA"). Local 527 is chartered by and subordinate to the

Graphic Communications International Union, AFL-CIO-CLC, hereinafter

referred to as "the International."

2. In December, 2002, the Local was comprised of approximately 1,100

members who were employed by 20 employers throughout the states of

Georgia, Tennessee, North Carolina, South Carolina, and Kentucky.

Affidavit of Norman E. Stafford (hereinafter "Stafford Aff.") at ¶3;

Deposition of Ralph M. Meers (hereinafter "Meers depo.") at 132:22.

3. The Local held an election in December, 2002, for the offices of President,

Vice-President, Secretary-Treasurer-Business Agent, Recording Secretary,

and Sergeant at Arms.  It was the Local's first contested election in twenty

to thirty years.  Meers depo. 55:10 through 56:17.

4. On January 1, 2002, the Local posted a notice at the main union hall in

Mableton, Georgia, and at other job sites consisting of a list of the

scheduled dates and the times of the Local Executive Board meetings, the

regular monthly meetings, and the officers and stewards training sessions

for 2002.  Stafford Aff. at ¶ 6; Exh. 2.  The notice indicated that eight

regular monthly meetings would be held in 2002, including a meeting on

November 10, 2002.  The notice did not indicate that nominations for union

officer election would be conducted at the November 10, 2002, regular

2

monthly meeting, nor did the notice specify the place of the nominations meeting or the procedure for submitting nominations.

5. Subsequently, a notice dated September 16, 2002, and entitled, "NOMINATION AND ELECTION OF OFFICERS," was posted in the union hall and at job sites. It indicated that nominations would be accepted at the "November 2002" regular monthly meeting, and listed the offices to be filled. Stafford Aff. at ¶ 7; Exh. 1. The September notice instructed the members to "observe the Union bulletin board for the date and time of the nominations," but did not itself specify the date, time, or place of the nominations meeting. No other nominations notices were posted by the Local.

6. The Local did not notify its members by mail that an election would be held in December 2002 for the purpose of electing officers. Stafford Aff. at ¶¶ 8, 10, 14; Meers depo. 78:1-23.

7. The Executive Board held a meeting on November 7, 2002, at which nominations were made for President, Vice-President/Secretary/Treasurer, Recording Secretary, and Sergeant at Arms. Incumbent President Ralph Meers (who has served in that office for nearly forty years), was nominated by a Board member for the office of President. Meers depo. 5:14-16; 50:5

3

through 53:3; Stafford Aff. at ¶ 21; Exh. P1. Board member Linda Ely nominated Paul Alexander for President, but the Board decided to endorse Meers, so it rejected Alexander's nomination. Meers depo. 50:16 through 53:13. Nominations were made by the Board for the other incumbent officers without opposition. Exh. P1.

8. On November 10, 2002, the Local held a nominations meeting at the Mableton union hall. Only approximately 25 rank-and-file members attended that meeting. Stafford Aff. at ¶ 22. The Board announced its endorsements for all candidates, including Ralph Meers for President. Paul Alexander was nominated for President from the floor. Deposition of Paul Alexander (hereinafter "Alexander depo.") at 24:16-24. Alexander, who arrived at the meeting ten minutes late, moved to reopen the nominations because other Local members wanted an opportunity to make nominations, but that request was denied. Alexander depo. at 19:14 through 20:15; 25:2-12. The two nominees for President were incumbent President Ralph Meers, and Paul Alexander.

9. By letter to the Local dated October 29, 2002, Alexander requested a membership list of Local members and the names and addresses of the shops in the Local for campaigning purposes. Alexander depo. at 26:16

4

through 27:8; Exhs. 4, 13.  President Meers responded by letter dated November 21, 2002, stating that Alexander's request would be considered at the December 5, 2002 Executive Board meeting, just three days before the election.  Exh. 5.

10. On November 18, 2002, Alexander wrote to the International, reporting that he had requested the names and addresses for the membership, but that the Executive Board had put off a decision until December 5.  Exh. 6.

11. President Meers responded to Alexander's request for names and addresses of Local members on November 25, 2002.  Alexander depo. at 36:14 through 37:4; Exh. 13 at 3.  After President Meers notified Alexander that mailing labels would be made available for a campaign mailing on November 25, 2002, Alexander assembled his materials and mailed them out on December 2, 2002.  Exh. 13 at 3; Alexander depo. at 34:7-11.

12. Although the mailing labels were ultimately provided at Alexander's expense, the Local never provided him with the names and addresses of the Local's shops in response to his request for that information.  Exh. 13 at 2; Meers depo. 58:23 through 60:15; Stafford Aff. at ¶5.

13. On December 8, 2002, an election was conducted at the main union hall located in Mableton.  Prior to that date, on-site voting had been concluded

5

at the various Chapels (shop locations) located outside the Atlanta regional area because the ballots of the members voting in those areas had to be received by the union no later than December 8, 2002. Stafford Aff. at ¶17; Exh. 13 at 3-4.

14. Each Chapel Chairperson was responsible for conducting the balloting at his site and the dates, sites and hours of polling were left to his discretion.

15. Although Alexander requested the information, the Local failed to inform him of the specific dates, sites and hours of polling in the outlying areas. Alexander depo. 35:9 through 36:13, 159:10-25; Exhs. 14, 27.

16. By the time Alexander made his campaign mailing on December 2, 2002, much of the balloting in the outlying areas had already occurred. Specifically, 130 ballots, voted at Cleveland, Tennessee, and Charlotte, North Carolina, were mailed by the chapel chairpersons to the local on December 3, 2002, the day after Alexander mailed his campaign literature. Stafford Aff. at ¶ 17.

17. The Local did not provide voting booths, partitions, or other physical privacy arrangements that would provide privacy for the voters as they marked their ballots at the Mableton union hall. Alexander depo. 156:16 through 158:11; Stafford Aff. at ¶¶ 14-16.

6

`

18. Members also voted without arrangements that would provide secrecy at the Charlotte, North Carolina, polling site. Stafford Aff. at ¶ 9. Voting at that site was conducted in a cafeteria located at the work site. Voters were allowed to sit next to each other as they marked their ballots, permitting members to freely discuss their ballot choices. Once a voter finished marking his or her ballot, the voter handed it to one of the two union stewards. The ballots were not enclosed in envelopes or concealed in any other manner when they were handed to the stewards. Id.

19. Members who voted at the LaGrange, Georgia; Lithonia, Georgia; Cleveland, Tennessee; and the Lexington, Kentucky, sites were permitted to mark their ballots in the open without voting booths, partitions, or other physical privacy arrangements. Stafford Aff. at ¶¶ 8, 10-12.

20. The final tally of the ballots after the election revealed that incumbent President Ralph Meers received 191 votes and Paul Alexander received 74 votes, a margin of victory of 117 votes. Exh. 9.

21. Alexander filed a protest with the International President on December 10, 2002, two days after the election, and sent a copy of that protest to the Local. Exh. 11.

7

22. The Local's Constitution and By-Laws do not contain a specific provision governing election protests. Meers depo. 34:9 through 36:5.

23. By March 10, 2003, three calendar months after Alexander filed his December 10, 2002 letter of protest, despite various exchanges with the Local and the International, Alexander still had not obtained a final decision from the Local with respect to his election protest. Alexander depo. at 105:11-24; 112:25 through 113:14. Alexander filed complaints with the Department of Labor on March 11, 2003 and on April 8, 2003, in accordance with 29 U.S.C. § 482(a)(2). Exhs. 21, 39.

24. Prior to the election in Cleveland on December 3, 2002, the members from that shop (approximately 140 to 150 members) were not mailed an election notice advising them of the election date, time and place. At the time of voting, members were offered the opportunity to vote as they passed by a time clock. Those who wanted to vote were issued a ballot and had the option of walking 20 feet away to a pallet stack available for use as a table to mark their ballot. However, most members walked two to three feet forward from where the ballot was issued, turned their back to the election committee, and marked their ballot. In the final tally for Cleveland, Meers received 82 votes, and Alexander received 16 votes. Stafford Aff. at ¶ 8.

8

25. As to the election activities in Charlotte, North Carolina (Greif Brothers Corporation), members who came to the elections meeting received their ballots as they entered a cafeteria. During the meeting, members voted their ballots while sitting next to each other in the cafeteria. After the meeting, some members gave their ballots to one of the two stewards while other members placed their ballot on the table near the assistant steward. In the final tally for Charlotte, Meers received 32 votes, and Alexander received zero votes. Stafford Aff. at ¶ 9.

26. As to the election activities in Lexington, Kentucky (Smurfit Stone Corporation), a notice of election was not mailed to members. In addition, the election was held in a cafeteria, where members sat wherever they wanted in the cafeteria, voted the ballot, and got in a line to drop their ballots in a ballot box. The ballots from Lexington were not counted toward the final tally reportedly because they were received after December 8. A review of the ballots indicated that Meers received 4 votes, and Alexander received 15 votes. Stafford Aff. at ¶ 10.

27. As to the election activities in LaGrange, Georgia (Tredegar Film Products), at the election meeting members obtained their ballots and went to one of 10-12 tables where they sat side-by-side and voted. In the final

9

tally for LaGrange, Meers received 25 votes, and Alexander received 2 votes.  Stafford Aff. at ¶ .

28. At one shop in Lithonia, Georgia (Greif Brothers Corporation), at least 10 members were unaware that an election was scheduled to take place in December 2002, until a few days before the election, when an election notice was posted by the shop steward at Paul Alexander's suggestion.  The same members were unaware that any nominations meeting for the nomination of candidates had taken place.  Moreover, on the day of the election, there was no place set aside for members to vote.  Members were handed their ballots and had to mark them wherever they could find a place in the union hall.  Stafford Aff. at ¶ 12.

29. The UPS envelopes containing the voted ballots sent by Chapel Chairpersons from Cleveland, Tennessee and Charlotte, North Carolina, to Local 527-S, are dated December 3, 2002.  These locations accounted for 130 votes cast in the election (98 from Cleveland, 32 from Charlotte).  Stafford Aff. at ¶ 17.

30.  There were 52 challenged ballots in the election that the Local did not include in the final tally.  Of the 52 ballots, 23 were sent from a local shop in Lexington, Kentucky and reportedly received after December 8, 2002,

10

the date on which they were due at the union hall. The Local did not attempt to validate the remaining challenged ballots. Stafford Aff. at ¶ 18.

31. One hundred seventy six (176) of the two hundred sixty five (265) total ballots counted were cast from areas outside of Atlanta. Alexander led fifty-four (54) to thirty-five (35) in the Mableton union hall election count before the off-site ballots were counted. Stafford Aff. at ¶ 19.

32. The ballots used in the election were prepared at Local 527-S by the office secretary. There were no controls on their production and no accountability in their use. Also, the election records were not sealed after the election. No secret ballot envelopes were used by the Local during the election. Stafford Aff. at ¶ 20.

/ / /

/ / /

/ / /

11

33. Approximately 25 rank-and-file members attended the nominations meeting at the main union hall on November 10, 2002.  Stafford Aff. at ¶ 22.

Respectfully submitted,

HOWARD M. RADZELY
Solicitor of Labor

PETER D. KEISLER
Assistant Attorney General

BARTON E. WIDOM
Acting Associate Solicitor
 For Labor Management Laws

WILLIAM S. DUFFEY, JR.
United States Attorney
for the Northern District of Georgia


*Mina Rhee*

MINA RHEE
Assistant United States Attorney
Provisionally admitted 7.28.03
U.S. Attorney's Office
600 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, Georgia 30303
(404) 581-6302
Fax: (404) 581-6234

Attorneys for Plaintiff

12

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ELAINE L. CHAO, Secretary of Labor, ) | |
| United States Department of Labor, ) | Civil Action |
| ) | |
| Plaintiff, ) | No. 1:03-CV-2581-CC |
| v. ) | |
| ) | |
| LOCAL 527-S, GRAPHIC ) | |
| COMMUNICATIONS UNION OF THE ) | |
| GRAPHIC COMMUNICATIONS ) | |
| INTERNATIONAL UNION, ) | |
| AFL-CIO-CLC, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

This case is brought by Plaintiff the Secretary of Labor against Local 527-S,

Graphic Communications Union of the Graphic Communications International

Union ("the Local" or "Local 527-S") pursuant to the Labor-Management

Reporting and Disclosure Act of 1959, 42 U.S.C. § 482(b) ("LMRDA"). The

subject of this action is an election that was held by the Local in December, 2002,

for the purpose of electing officers. The election suffered from several serious

procedural defects that may have affected the outcome of the election. Accordingly, Plaintiff seeks to have this Court, pursuant to 29 U.S.C. § 482(c), declare the election void and order that a new election be conducted under the supervision of the Secretary of Labor.

It is undisputed that the election suffered from numerous deficiencies, including: (a) failure by the Local to comply with the LMRDA's requirement to provide members with written notice of the election by mail not less than fifteen (15) days before the election; (b) failure of the Local to ensure that ballots were cast in secret; (c) failure of the Local to provide a reasonable opportunity for members to nominate candidates for office; and (d) failure of the Local to ensure that other adequate safeguards were in place for the conduct of a fair election, including the right of a candidate to mail out campaign literature and to have poll watchers present during balloting. In sum, the undisputed facts demonstrate that the Local did not have appropriate procedures in place to ensure a fair and free democratic election as required by the LMRDA.

Once the Secretary establishes a violation of the LMRDA, she establishes a *prima facie* case that the alleged violation "may have affected" the outcome of the election. See Chao v. Local 54, Hotel and Restaurant Employees Int'l Union, 166 F. Supp.2d 109, 123-24 (D.N.J. 2001). In order to avoid summary judgment, the

Local must counter with tangible evidence that the violation did not in fact affect the result, a burden that the Local simply cannot meet here. Id. Plaintiff respectfully moves this Court for summary judgment in Plaintiff's favor and asks that the Court order the Local to conduct a new, supervised election.

## II.    FACTS AND PROCEDURAL HISTORY

Local 527 is a local labor organization subject to the requirements of the LMRDA. Local 527 is chartered by and subordinate to the Graphic Communications International Union, AFL-CIO-CLC, hereinafter referred to as "the International." In December, 2002, the Local was comprised of approximately 1,100 members who were employed by 20 employers throughout the states of Georgia, Tennessee, North Carolina, South Carolina, and Kentucky. Affidavit of Norman E. Stafford (hereinafter "Stafford Aff.") at ¶3; Deposition of Ralph M. Meers (hereinafter "Meers depo.") at 132:22.

Consistent with 29 U.S.C. § 481(b), Article 7 of the Local's constitution provides that elections for the offices of President, Vice-President, Secretary-Treasurer-Business Agent, Recording Secretary, and Sergeant at Arms be held every three years. Exh. B, at 9.[1] The Local had planned to hold an election in

[1] Exhibits 1-40 are included in the sealed deposition transcripts of Paul Alexander and Ralph Meers, filed with the parties' motions. Exhibits A, B and C have been filed by Defendant with its motion for summary judgment. Plaintiff's exhibit P1 is

3

December, 2002, for the purpose of electing officers. It was the Local's first contested election in twenty to thirty years. Meers depo. at 55:10 through 56:17.

On January 1, 2002, the Local posted a notice at the main union hall in Mableton, Georgia, and at other job sites consisting of a list of the scheduled dates and the times of the Local Executive Board meetings, the regular monthly meetings, and the officers and stewards training sessions for 2002. Stafford Aff. at ¶ 6; Exh. 2. The notice indicated that eight regular monthly meetings would be held in 2002, including a meeting on November 10, 2002. The notice did not indicate that nominations for union officer election would be conducted at the November 10, 2002, regular monthly meeting, nor did the notice specify the place of the nominations meeting or the procedure for submitting nominations.

Subsequently, a notice dated September 16, 2002, and entitled, "NOMINATION AND ELECTION OF OFFICERS," which the Local contends was posted in the union hall and at job sites, indicated that nominations would be accepted at the "November 2002" regular monthly meeting, and listed the offices to be filled. Stafford Aff. at ¶ 7; Exh. 1. The September notice instructed the members to "observe the Union bulletin board for the date and time of the nominations," but did not itself specify the date, time, or place of the nominations

---

attached to the Affidavit of Norman E. Stafford, filed herewith.

4

meeting. The Local did not notify its members by mail that an election would be held in December 2002 for the purpose of electing officers. Stafford Aff. at ¶¶ 8, 10, 14; Meers depo. at 78:1-23.

The Executive Board held a meeting on November 7, 2002, at which nominations were made for President, Vice-President/Secretary/Treasurer, Recording Secretary, and Sergeant at Arms. Incumbent President Ralph Meers (who has served in that office for nearly forty years), was nominated by a Board member for the office of President. Meers depo. at 5:14-16; 50:5 through 53:3; Stafford Aff. at ¶ 21; Exh. P1. Board member Linda Ely nominated Paul Alexander for President, but the Board decided to endorse Meers, so it rejected Alexander's nomination. Meers depo. at 50:16 through 53:13. Nominations were made by the Board for the other incumbent officers without opposition. Exh. P1.

On November 10, 2002, the Local held a nominations meeting at the Mableton union hall. Only approximately 25 rank-and-file members attended that meeting. Stafford Aff. at ¶ 22. The Board announced its endorsements for all candidates, including Ralph Meers for President. Paul Alexander was nominated for President from the floor. Deposition of Paul Alexander ("hereinafter Alexander depo.") at 24:16-24. Alexander, who arrived at the meeting ten minutes late, moved to reopen the nominations because other Local members wanted an

5

opportunity to make nominations, but that request was denied. Alexander depo. at 19:14 through 20:15; 25:2-12. Thetwo nominees for President were incumbent President Ralph Meers and Paul Alexander.

By letter to the Local dated October 29, 2002, Alexander requested a membership list of Local members and the names and addresses of the shops in the Local for campaigning purposes. Alexander depo. at 26:16 through 27:8; Exhs. 4, 13. President Meers responded by letter dated November 21, 2002, stating that Alexander's request would be considered at the December 5, 2002 Executive Board meeting, just three days before the election scheduled for December 8. Exh. 5. On November 18, 2002, Alexander wrote to the International, reporting that he had requested the names and addresses of the membership, but that the Executive Board had put off a decision until December 5. Exh. 6. President Meers responded to Alexander's request for names and addresses of Local members on November 25, 2002, after intervention by the Department of Labor Office of Labor-Management Standards based on a complaint filed by Alexander. Stafford Aff. at ¶4; Alexander depo. at 36:14 through 37:4; Exh. 13 at 3. After President Meers notified Alexander that mailing labels would be made available for a campaign mailing on November 25, 2002, Alexander assembled his materials and mailed them out on December 2, 2002. Exh. 13 at 3; Alexander depo. at 34:7-11.

6

Although the mailing labels for individual members were ultimately provided at Alexander's expense, the Local never provided him with the names and addresses of the Local's shops in response to his request for that information. Exh. 13 at 2; Meers depo. at 58:23 through 60:15; Stafford Aff. at ¶5.

On December 8, 2002, an election was conducted at the main union hall located in Mableton. Prior to that date, on-site voting had been concluded at the various Chapels (shop locations) located outside the Atlanta regional area because the ballots of the members voting in those areas had to be received by the union no later than December 8, 2002. Stafford Aff. at ¶17; Exh. 13 at 3-4. Each Chapel Chairperson was responsible for conducting the balloting at his site and the dates, sites and hours of polling were left to his discretion. Although Alexander requested the information, the Local failed to inform him of the specific dates, sites and hours of polling in the outlying areas. Alexander depo. at 35:9 through 36:13, 159:10-25; Exhs. 14, 27. By the time Alexander had made his campaign mailing on December 2, 2002, much of the balloting in the outlying areas had already occurred. Specifically, 130 ballots, voted at Cleveland, Tennessee, and Charlotte, North Carolina, were mailed by the chapel chairpersons to the local on December 3, 2002, the day after Alexander mailed his campaign literature. Stafford Aff. at ¶ 17.

The Local did not provide voting booths, partitions, or other physical privacy arrangements that would provide privacy for the voters as they marked their ballots at the Mableton union hall. Alexander depo. at 156:16 through 158:11; Stafford Aff. at ¶¶ 14-16. Members also voted without arrangements that would provide secrecy at the Charlotte, North Carolina, polling site. Stafford Aff. at ¶ 9. Voting at that site was conducted in a cafeteria located at the work site. Voters were allowed to sit next to each other as they marked their ballots, permitting members to freely discuss their ballot choices. Once a voter finished marking his or her ballot, the voter handed it to one of the two union stewards. The ballots were not enclosed in envelopes or concealed in any other manner when they were handed to the stewards. Id. Also, members who voted at the LaGrange, Georgia; Lithonia, Georgia; Cleveland, Tennessee; and the Lexington, Kentucky, sites were permitted to mark their ballots in the open without voting booths, partitions, or other physical privacy arrangements. Stafford Aff. at ¶¶ 8, 10-12.

The final tally of the ballots after the election revealed that incumbent President Ralph Meers received 191 votes and Paul Alexander received 74 votes, a margin of victory of 117 votes. Exh. 9.

Alexander filed a protest with the International President on December 10, 2002, two days after the election, and sent a copy of that protest to the Local. Exh.

11.[2] By March 10, 2003, three calendar months after Alexander filed his December 10, 2002 letter of protest, despite various exchanges with the Local and the International, Alexander still had not obtained a final decision from the Local with respect to his election protest. Alexander depo. at 105:11-24; 112:25 through 113:14. Alexander filed complaints with the Department of Labor on March 11, 2003 and on April 8, 2003, in accordance with 29 U.S.C. § 482(a)(2). Exhs. 21, 39. After conducting an investigation and finding probable cause that a violation of the LMRDA had occurred in the conduct of the Local's December 2002 election, the Secretary filed this lawsuit against the Local on August 28, 2003.[3] 29 U.S.C. § 482(b).

## III.  SUMMARY JUDGMENT STANDARD

Summary judgment should be entered whenever "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he burden on

---

2 The Local's Constitution and By-Laws do not contain a specific provision governing election protests. Meers depo. at 34:9 through 36:5. In the absence of any guidance on the matter of an election protest, Alexander sent copies of all correspondence protesting the election to the International and to the Local. Alexander depo. at 81:21-24.

3 By two written agreements, the Secretary of Labor and the Local agreed to extend

the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).[4]

## IV.    ARGUMENT

The Local's December 2002 election suffered from numerous deficiencies, any one of which likely affected its outcome. Because the Local failed to comply with even the most basic requirements of a fair election process required by the LMRDA, the results of the election cannot stand.

The principal purpose of the LMRDA is to promote fair and democratic practices in unions. In the 1950's, Congress investigated the nation's unions and found corruption in union leadership and disregard for the rights of the rank-and-

---

the filing date in this case from June 9, 2003, to August 29, 2003.

[4] A court may properly grant summary judgment in actions brought under the LMRDA. See Brennan v. Local Union No. 639, Int'l Brotherhd. of Teamsters, Chauffers and Warehousemen and Helpers of Am., 494 F.2d 1092, 1094-97 (D.C. Cir. 1974). The summary judgment standard, however, "cannot be analyzed in a vacuum, but can only be understood in the context of the statute under which the action was brought since the statute determines (a) what the material facts are and (b) when a party is entitled to a judgment as a matter of law." Id. at 1096-97.

file members.  See Wirtz v. Hotel, Motel and Club Employees Union, Local 6, 391

U.S. 492, 497-98 (1968);[5] Wirtz v. Local 153, Glass Bottle Blowers Ass'n, 389

U.S. 463, 468-70 (1968).  Through the LMRDA, Congress sought to "protect the

rights of rank-and-file members to participate fully in the operations of their union

through processes of democratic self-government. . . ." Hotel, Motel and Club

Employees Union, Local 6, 391 U.S. at 497.  Recognizing that free and fair

elections were essential to union self-government, Congress provided the

safeguards of Title I and Title IV of the LMRDA "to provide a fair election and

guarantee membership participation." American Federation of Musicians v.

Wittstein, 379 U.S. 171, 182 (1964); See also Wirtz v. American Guild of Variety

Artists, 267 F. Supp. 527, 544 (S.D.N.Y. 1967) (discussing a union's duty to

"conduct[] democratic and scrupulously fair elections").  In addition, the

protections of Title IV were intended to offset some of the inherent advantages that

---

5 Section 401 of Title IV of the LMRDA, at 29 U.S.C. § 411, prescribes standards
to govern the conduct of union elections:

> Elections must be by secret ballot.  Specific provisions insure equality of
> treatment in the mailing of campaign literature; require adequate safeguards
> to insure a fair election; guarantee a "reasonable opportunity" for the
> nomination of candidates, the right to vote, and the right of every member in
> good standing to be a candidate subject to "reasonable qualifications
> uniformly imposed[.]"

391 U.S. at 498.

incumbents enjoy over rank-and-file members.  See International Organization of Masters, Mates & Pilots v. Brown, 498 U.S. 466, 476 (1991).

> A.    Local 527-S violated section 401(e) of the LMRDA, 29 U.S.C. § 481(e), by failing to mail the Notice of the election to the last known home address of each member at least fifteen days prior to the election.

The most blatant violation of the LMRDA by the Local arose when it failed to mail out notice of the election to the membership prior to the election, in violation of 29 U.S.C. § 481(e).  Section 481(e) requires that "not less than fifteen days prior to the election notice thereof shall be mailed to each member at his last known home address."  In enacting this provision, "Congress intended at a minimum that the notice of an election be mailed to each member" at his last known address, "and that other means of giving such notice, however reasonable, were insufficient."  Brennan v. International Brotherhood of Teamsters, Local 639, 494 F.2d 1092, 1097-98 (D.C. Cir. 1974).  The LMRDA "clearly and unambiguously requires that notice of the election be sent to the last known home address of each member."  Marshall v. Office and Professional Employees Union, Local 2, 505 F. Supp. 121, 123 (D.D.C. 1981).

12

The Secretary's interpretative regulations summarize the proper approach in

analyzing whether members were provided proper notice of the election.  The

regulations provide the following requirements:

> Elections required by title IV to be held by secret ballot must be
> preceded by a notice of election mailed to each member at his
> last known home address not less than fifteen days prior to the
> election . . . .  The notice must include a specification of the
> date, time and place of the election and of the offices to be
> filled, and it must be in such form as to be reasonably calculated
> to inform the members of the impending election. . . .  A
> statement in the union bylaws that an election will be held at a
> certain time does not constitute the notice required by the
> statute. *Since the Act specifies that the notice must be mailed,
> other means of transmission such as posting on a bulletin board
> or hand delivery will not satisfy the requirement.*  A notice of
> election must be sent to every member as defined in section 3(o)
> of the Act, not only to members who are eligible to vote in the
> election . . . .

29 C.F.R. § 452.99 (emphasis added).[6]

Consistent with the Secretary's interpretative regulations, courts have held

that nothing short of strict compliance with the mailing requirement is sufficient.

See Chao v. Local 54 Hotel, Employees and Restaurant Employees Int'l Union, 166

---

[6] Although the Secretary's interpretative regulations are not binding on courts, see
29 C.F.R. §451.1(c), courts have given the regulations weight.  See Donovan v.
Sailors' Union of the Pacific, 739 F.2d 1426 (9th Cir. 1984), cert. denied, 471 U.S.
1004 (1985); Chao v. Bremerton Metal Trades Council, 294 F.3d 1114, 1122 n.5
(9th Cir. 2002).

F. Supp.2d 109, 114-15 (D.N.J. 2001).  The court in <u>Local 54</u> examined the legislative history of Section 481(e) and noted that the while an earlier version of the bill directed that notice of an election be given in a manner "reasonably calculated" to inform "substantially" all of a union's membership, that language was ultimately replaced with an explicit instruction that written notice of the election, and its date, time and place be mailed to all members at their last known address.  <u>Id.</u> at 114.

It is undisputed that the Local did not mail out notice of the election to the membership.  Stafford Aff. at ¶¶ 8, 10, 14; Meers depo. at 78:1-23.  Although the Local may contend that it posted notices of the election on union bulletin boards, such postings cannot be substituted for the specific section 401(e) requirement of mailing the election notice.[7]  <u>Shultz v. Independent Employees Union of Packerland Packing</u>, 1970 WL 5444 (W.D. Wis. April 23, 1970), 74 LRRM (BNA) 2137.  In this case, posting was even more plainly insufficient, as neither of the election notices contained information that adequately informed the members of date, site, and hours of polling.  Consequently, of the approximately 1,100

---

[7]    Even the International, to which the Local is subordinate, has recognized the importance of the mailing requirement.  Sections 13 and 19 of Article XIII of the International's constitution require that each member be mailed, at his or her last known address, written notice of an International election not less than 15 days before such election.  Exh. B.  A similar provision is conspicuously absent from the Local's constitution.

members, only 317 of them voted in the election, leaving more than 780 members who did not vote for reasons that may have had to do with the union's failure to mail notice of the election to their last known home addresses. Exh. 9.

B.   Local 527-S violated section 401(b) of the LMRDA, 29 U.S.C. § 481(b), when it failed to conduct its 2002 election of officers by secret ballot.

The December 2002 election also suffered from a fatal deficiency in that the Local did not conduct voting by secret ballot. Section 481(b) provides, "[e]very local labor organization shall elect its officers not less than once every three years *by secret ballot* among the members in good standing." 29 U.S.C. § 481(b) (emphasis added). "Secret ballot" is defined as "the expression by ballot, voting machine, or otherwise, but in no event by proxy, of a choice with respect to any election or vote taken upon any matter, which is cast in such a manner that the person expressing such choice cannot be identified with the choice expressed." 29 U.S.C. § 402(k).

The Department of Labor's interpretative regulations provide in pertinent part:

> Secrecy may be assured by the use of voting machines or if paper ballots are used, by providing voting booths, partitions or other physical arrangements permitting privacy for the voter while he is marking his ballot. The ballot must not contain any markings which upon examination would enable one to identify it with the voter.

15

29 C.F.R. § 452.97(a).

Courts interpreting the secret ballot provisions of the LMRDA have concluded that the use of a secret ballot is mandatory, and it is the union's, not the voter's, duty to ensure that ballots are marked in secrecy. See Donovan v. CSEA Local Union 1000, American Federation of State, County and Municipal Employees, 594 F. Supp. 188, 196 (N.D.N.Y. 1984), aff'd in part and rev'd in part on other grounds, 761 F.2d 870 (2d Cir. 1985); Marshall v. Local Union 12447, United Steelworkers, 591 F.2d 199, 203-04 (3d Cir. 1978); [8] Brennan v. Local Union 3489, United Steelworkers, 520 F.2d 516, 522 (7th Cir. 1975), aff'd on other grounds, 429 U.S. 305 (1977); Bachowski v. Brennan, 413 F. Supp. 147, 150-51 (W.D. Pa.), appeal dismissed for lack of final order, 545 F.2d 363 (3d Cir. 1976).

In this case, it is undisputed that the Local failed to provide voting booths, partitions, or other physical arrangements permitting privacy for the voter while the voter marked his or her ballot at the polling sites located in the Mableton, Charlotte, LaGrange, Lithonia, Cleveland, and Lexington polling sites. Alexander depo. at 156:16 through 158:11; Stafford Aff. at ¶¶ 8-12, 14-16; Meers depo. at 63:11

---

8 In CSEA Local Union 1000, the court cited Local Union 12447, United Steelworkers with favor, stating that a violation of the LMRDA would occur even if the evidence showed only that, because of the way the election was conducted, it was possible to observe how some voters had marked their ballots. 594 F. Supp. at 196.

16

through 68; 69:18 through 73:7. In all of these locations, members had to either mark their ballots in the open, or try to hide their ballot in some way while marking it. Tellingly, President Meers is of the opinion that the secrecy requirement was met by the Local if "[w]hen the member is given a ballot, they are told it's a secret vote, please feel free to go anywhere you want to in the area here, mark your ballot, and bring it back" Meers depo. at 72:20 through 73:1. Under the authority cited above, such an instruction, standing alone, cannot satisfy the secrecy requirement.

Because the Local permitted voters to vote in the open at such sites, an individual voter was susceptible to potential coercion or intimidation. See Bachowski, 413 F. Supp. at 150 (by imposing the requirement of secrecy, Congress meant to eliminate any such form of potential coercion or intimidation). Moreover, "secrecy and safeguards are for the benefit of the challenger and the absence of secrecy and safeguards can only benefit the incumbent who controls the machinery of the union and can affect votes through fear or hope of favor." Id.; CSEA Local Union 1000, American Federation of State, County and Municipal Employees, 594 F. Supp. at 196-97 (citing Bachowski).

Here, the Local had a duty to take all reasonable steps to assure that every voter marked his ballot in secret, and breached that duty when voters were permitted to vote in open areas, sometimes congregated at the same table or in front

17

of election officials, without any arrangements to preserve voting secrecy. The evidence shows that at least 246 counted ballots were voted at polling sites where the Local failed to provide partitions or similar arrangements to preserve voting secrecy. Stafford Aff. at ¶¶ 8, 9, 11, 19. Of these ballots, 193 were cast for the winning presidential candidate Meers, and 53 were cast for Alexander. Id. Inasmuch as the Local failed to provide adequate voting facilities at these sites and failed to ensure that voters could not be identified with their choices, it did not conduct its election by secret ballot, in violation of 29 U.S.C. § 481(b).

C.    Local 527-S violated section 401(e) of the LMRDA, 29 U.S.C. § 481(e), by failing to provide timely and adequate notice of the nominations meeting, thereby depriving members in good standing of a reasonable opportunity to nominate a candidate or to be nominated for office.

Among the safeguards that Congress provided in Title IV of the Act is the requirement that "in any election required by Section 401 to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates." 29 U.S.C. § 481(e). The Secretary of Labor's interpretative regulations summarize the proper approach in analyzing whether members have been provided a reasonable opportunity for the nomination of candidates. The regulations provide the following requirements:

> [T]he labor organization must give timely notice reasonably calculated to inform all members of the offices to be filled in the

18

> election as well as the time, place, and form for submitting
> nominations. . . . In an election which is to be held by secret
> ballot, notice of nominations may be given in any manner
> reasonably calculated to reach all members in good standing and
> in sufficient time to permit such members to nominate the
> candidates of their choice, so long as it is in accordance with the
> provisions of the labor organization's constitution or bylaws.

29 C.F.R. § 452.56(a).

Consistent with the Secretary's interpretative regulations, courts have found

that members were not provided a reasonable opportunity for the nomination of

candidates in various circumstances where members were not properly notified of

the nominations meeting.  See Donovan v. International Ass'n of Machinists, Local

Lodge 851, 622 F. Supp. 394, 396-97 (N.D. Ill. 1985) (violation of section 401(e)

where 2,691 laid-off members of a total of 4,750 members may not have seen the

notices of nominations posted on 21 bulletin boards throughout the plant and union

hall); Marshall v. Office and Professional Employees Union, Local 2, 505 F. Supp.

121, 122-23 (D.D.C. 1981) (violation of section 401(e) where the union failed to

post notices at two employer locations); Usery v. Sheet Metal Workers, Local 20,

1980 WL 18722 (D.N.J. March 26, 1980), 105 LRRM (BNA) 3203 (violation of

section 401(e) where a portion of the membership was not sent notices of

nominations and notices were not posted at some work sites); Herman v. Local 50,

Service Employees International Union, 211 F.Supp.2d 1111, 1117-18 (E.D. Mo.

2001)(violation of section 401(e) where nominations notice was sent after the deadline for obtaining nomination petitions, no notices were posted, and not all members had received mailed copies of the constitution and bylaws, which set forth the time in which petitions could be obtained).

The obvious purpose of section 401(e)'s nominations notice requirement is to ensure maximum participation in union elections by the rank and file members. See Donovan v. Sailors' Union of the Pacific, 739 F.2d 1426, 1430 (9th Cir. 1984), cert. denied, 471 U.S. 1004 (1985). Here, the Local failed to ensure such participation. Although nominations were conducted at the November 7 Executive Board meeting and at the November 10 membership meeting, the January nominations notice did not indicate that nominations would be conducted at those meetings. Nor did it specify the site of the nominations meeting, the offices for which nominations would be accepted, or the procedure or form for submitting nominations. Stafford Aff. at ¶ 6. While the September notice indicated the available offices and the form for submitting nominations, the notice did not specify the date, time, or site of the meeting. Stafford Aff. at ¶ 7. Even by attempting to piece together and construe the various provisions in the two notices, an exceptionally diligent member would

20

still have been unable to determine the site of the meeting.  See International Ass'n

of Machinists, Local Lodge 851, 622 F. Supp. 394, 396-97 (D.C. Ill. 1985).[9]

Had the Local provided its approximately 1,100 members with adequate and

timely notice of the nominations meeting, members other than those who were

nominated to office may have been nominated and elected.

> D.    Local 527-S violated the adequate safeguards provision in
> section 401(c) of the LMRDA, 29 U.S.C. § 481(c), by failing to
> notify Alexander of the dates, sites and hours of polling in the
> outlying areas, and by failing to timely provide him with
> membership addresses.

Section 401(c) of the Act, 29 U.S.C. § 481, states, "[a]dequate safeguards to

insure a fair election shall be provided, including the right of any candidate to have

an observer at the polls and at the counting of the ballots."  The Act provides a

mandate that the adequate safeguards clause apply as a general rule of fairness.  29

C.F.R. § 452.110(a).  Adequate safeguards, as contemplated in the Act, specifically

refer to the mechanical procedural protections that must be afforded union members

---

9 In addition to the inadequacy of the content of the January and September notices, there is evidence that members did not see the notices posted on the union bulletin board or at some work sites, casting doubt as to whether they were posted. Stafford Aff. at ¶12.  The evidence also showed that in those cases where the notices were confirmed to be posted, they were not posted until just prior to the nominations meeting.  Consequently, notice of the nominations meeting was not given in a manner reasonably calculated to reach all members in good standing and in sufficient time to permit such members to nominate the candidates of their choice.

in an election of officers. See Brock v. Writers Guild of America, West, Inc., 762 F.2d 1349, 1356 (9th Cir. 1985).

Although the two specific examples included in the adequate safeguards clause (relating to observer rights) directly concern the integrity of the vote-counting process, courts have found that the adequate safeguards requirement embraces more than the mere counting of the ballots. See Hodgson v. United Mine Workers, 344 F. Supp. 17, 26-27 (D.D.C. 1972); Hodgson v. District No. 5, United Mine Workers of America, 353 F. Supp. 108, 115 (W.D. Pa. 1973). In Independent Employees Union of Packerland Packing, 1970 WL 5444 (W.D. Wis. April 23, 1970), 74 LRRM (BNA) 2137, the court found that the union had not provided adequate safeguards where a labor organization failed to permit candidates to have observers throughout the election process.

Here, the dates, hours and sites of polling in the outlying areas were left to the discretion of each chapel chairperson. Because the Local failed to provide Alexander with the dates, hours and sites of polling, he was not aware when and where polling would occur. Many of the members located in the outlying areas voted during the first few days of December, prior to receiving Alexander's campaign literature. Although the Secretary's investigation could not determine the

22

precise number of members who voted prior to receiving the complainant's campaign materials, at least 157 of the ballots counted were cast by members at sites located in the outlying areas. The margin of victory for President Meers was only 117 votes.

Thus, the Local's failure to provide information to the candidates concerning the dates, sites and hours of polling in the outlying areas deprived Alexander of: (a) a reasonable opportunity to reach the members located in such areas through his campaign literature before they voted, and (b) to have poll watchers present during balloting. Furthermore, there were other irregularities suggesting that the election was not run with reasonable controls to assure fairness in voting. Stafford Aff. at ¶ 20.

## V.    CONCLUSION

Section 402(c) of the LMRDA, 29 U.S.C. § 482(c), requires a court to declare a contested election void and order a new election under the Secretary's supervision if the Secretary proves that a violation of section 401 "may have affected the outcome of the election." Wirtz v. Hotel, Motel & Club Employees Union, Local 6, 391 U.S. 492, 506-507 (1968). A violation of Section 401 of the LMRDA constitutes *prima facie* evidence that the outcome of the challenged election may have been affected. See Chao v. Local 54, Hotel and Restaurant

Employees Int'l Union, 166 F. Supp.2d 109, 123-24 (D.N.J. 2001). Because the Secretary has established that the Local violated the LMRDA in the respects discussed above, the burden shifts to the Local to present tangible proof sufficient to establish that the outcome of the election was not affected. Id. In any event, the Secretary is required to prove only that there is a "reasonable probability" that the established violations "may have affected" the outcome, not that the election results were actually affected. Id. (further citations omitted); Chao v. Amalgamated Transit Union, 141 F. Supp.2d 13, 17, 24 (D.D.C. 2001) (concluding that the burden on the Secretary to prove that the violation "may have affected" the outcome of the uncontested races "is quite low.").

In sum, the undisputed facts establish that the Local violated the LMRDA by (a) failing comply with the LMRDA's requirement that union members be mailed notice of the election not less than fifteen (15) days prior to the election; (b) failing to ensure that ballots were cast in secret; (c) failing to provide a reasonable opportunity for members to nominate candidates for office; and (d) failing to ensure that other adequate safeguards were in place for the conduct of a fair election. These violations may have affected the outcome of the election, which is all that the Secretary must show. Because the Local has an insurmountable burden of presenting evidence that, absent the violations, the outcome of the election would

24

have been the same, the Secretary is entitled to judgment as a matter of law.

Accordingly, for the reasons set forth above, Plaintiff respectfully moves this Court to enter summary judgment against Local 527-S, declare the December 2002 election void, and order that a new election be held under the supervision of the Secretary of Labor.

Respectfully submitted,

HOWARD M. RADZELY
Solicitor of Labor

PETER D. KEISLER
Assistant Attorney General

BARTON E. WIDOM
Acting Associate Solicitor
 For Labor Management Laws

WILLIAM S. DUFFEY, JR.
United States Attorney

Mina Rhee

MINA RHEE
Assistant United States Attorney
Provisionally admitted 7.28.03
U.S. Attorney's Office
600 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, Georgia 30303
(404) 581-6302
Fax: (404) 581-6234

Attorneys for Plaintiff

25

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to LR 7.1.D., NDGa., that the foregoing

Memorandum of Law by plaintiff United States of America was prepared in

14 point Times New Roman font.

Mina Rhee
Assistant U.S. Attorney
Provisionally Admitted 7.28.03

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

ELAINE L. CHAO, SECRETARY OF)
LABOR, UNITED STATES          )
DEPARTMENT OF LABOR,          )
                              )
        Plaintiff,            )
                              )
Vs.                           )    CIVIL ACTION FILE
                              )
LOCAL 527-S, GRAPHIC          )    NO. 1:03-CV-2581-CC
COMMUNICATIONS UNION OF THE )
GRAPHIC COMMUNICATIONS        )
INTERNATIONAL UNION,          )
AFL-CIO-CLC,                  )
                              )
        Defendant.            )

---

DEPOSITION OF RALPH M. MEERS

MARCH 17, 2004

11:20 A.M.

---

CERTIFIED COURT REPORTERS

The Pinnacle, Suite 500 • 3455 Peachtree Road, N.E. • Atlanta, Georgia  30326 • www.premierrptg.com

404-237-1990
800-317-5773

Page 5

A        I understand.

Q        Can you state your full name.

A        It's Ralph Martin Meers.

Q        And where do you live?

A        It's 4882 Rockmart Highway, Dallas, Georgia, 30132.

Q        And are you employed?

A        Yes, I am.

Q        And where are you employed?

A        With the Graphic Communications Union Local 527-S.

Q        What is your position at the local union?

A        President.

Q        And how long have you been president of the union?

A        Approximately 40 years.

Q        Do you have any other businesses?

A        No.

Q        Or any other sources of income?

A        No.

Q        Have you held any other positions within the local before becoming president?

A        Yes.  I was shop steward, sergeant-at-arms, and then vice president of the local.

Q        And that was all prior to becoming

international union election.

Q       So for example, if we're looking at Section 17, where there's a provision that allows a member to challenge election results, your understanding would be that that does not apply to challenges at the local level?

A       That's my understanding.  It does not apply.

Q       Does the local's constitution have a similar provision regarding challenges to elections?

A       Let me take a look and see if I can recall. I believe the only provision that I can recall in regards to that would be under article, would be Part 2, bylaws, Article 1, Section 6, Page 18.  That's where it refers then, exhausting all of the laws under the international union.

Q       That deals with, basically, the avenues which a member needs to take in order to have considered to have exhausted his remedies, right, before appealing to the international or --

A       Well, no.  That's --

Q       Or I'm sorry.  Going to --

A       That's going through the total appeals. And that would be, a good example would be just the, what we went through previously under the Article 19.  That's

Page 35

an avenue for redress. It isn't in conflict with the local constitution and bylaws. Therefore, both support one another.

The international constitution and bylaws and the local support each other. And that to me would be an example where a person would follow that and exhaust all remedies before going outside to the courts.

Q  We were looking at Article 13, Section 17 of the international's constitution, which sets forth a procedure when a member wants to challenge an election of the international --

A  What was that article again? I'm sorry.

Q  Page 33.

A  Well, a challenge by the members, this is pertaining to the election of the officers of the international union here, as I understand it.

Q  And then as I understand your response, Section 6 of Article 1 of the bylaws is what you think is the analogue to Section 17?

A  It would, Article 19, it would tie in to Article 19 as the procedure for a member who brings charges with a local. That would be consistent with Article 9 and Article 10, I think, of the local constitution and bylaws.

Q  But by its express terms, it doesn't apply

to challenges to an election; right?  Section 6 doesn't expressly state that that applies to challenges to elections; right?

A    Well, I think you're right.  I don't think it specifically.  It could mean a number of other things.

Q    Do you have personal experience with Article 19?  And by that, I mean have any charges ever been filed against you as the president of the local under Article 19?

A    Yes.  Charges were brought by another member in another local.  And that was fostered to the president of the international union and to the general board of the international union.

They formed a trial committee -- well, I'm sorry, investigative committee to begin with, and then they brought charges against me.  And I have firsthand knowledge of how that process works.  It can be very trying and very cruel and inhumane as a union.  But nevertheless, that's the process that -- and the system ultimately works.

Q    Well, how did it, can you just describe for me how the process worked in your situation.  After the investigation was conducted -- was that conducted by the general board?

A    Yes.  Yes.

posted the notices?

A      I think the Cleveland local is one.  I think the Charlotte local.  Seems like Spartanburg may have also been included in that.

Q      On Item Number 2 on Exhibit 13, it talks about an executive board meeting that was held on November 7, 2002.  Can you walk me through the process of nominations that occurred at that executive board meeting?

A      Yes.  The offices that were open for nomination, that would have been the president.  The board, the executive board combined the secretary, treasury, organizer and vice president into one office.  And then the sergeant-at-arms and then recording secretary.

And the nominations were opened for each of those offices.  And the nomination, I was nominated for president.  And Paul Alexander was nominated by, I believe it was Linda Ely, who is an executive board member from National Envelope.

And the executive board is the nominating and election committee.  And therefore, the executive board recommended to the membership that I would be the one that the board was nominating and electing to present to the membership.  And therefore, my name was the only

Page 51

one that was fostered from the executive board showing support from the board.

Q    So if I understand you correctly, the executive board meets, met on November 7th, and were there other non-executive board members present or it was just executive board members?

A    Well, each plant has one person that's designated as a board member. But the chairmen in each plant are automatically included as being a part of the executive board.

I've never prevented a chairman from speaking or even voting in the executive board. So we try to bring in more people to the process. So at that meeting, I think it was just the executive board members was present.

Q    And the executive board, there are nominations made from executive board members for the officer positions; right?

A    Well, they make it from the membership. They'll make the nominations from the membership, and their recommendations then go to the --

Q    Well, I guess what I'm saying is executive board members are the ones making the nominations at that meeting; right?

A    At that meeting, yes. Yes.

Q    All right.  And then the procedure is that there are recommendations made by the executive board that are then taken to the next membership meeting?

A    That's --

Q    Is that right?

A    No.  The nominations that the executive board makes at that meeting, they are recommendations to the membership.  And then the membership receives additional nominations.

And then they take the recommendations from the executive board and any additional nominations, and then that becomes the process of the ones who are running for office.

Q    So in this case, on November 7, you and Mr. Alexander were both nominated for the position of president; right?

A    No.  His name was nominated at the executive board.  The executive board did not approve his name for nomination.  Therefore, I was the only one that was nominated for president at the November 7th meeting.

Q    But at that meeting, two nominations were made for president, you and Paul Alexander; right?

A    Two names came up, was tossed out.

Q    Well, how did that happen?  Did somebody say, I nominate Paul Alexander for president, and

Page 53

somebody on your behalf said, I nominate Ralph Meers for president?

A    Yeah.

Q    And then describe for me the process through which the board goes to make a recommendation to take to the membership.

A    Well, the executive board voted who to endorse and advance to the membership.

Q    So it's an endorsement, basically, not a recommendation?

A    Well, I mean, we call it recommendation. It's an endorsement.  They are the ones that are submitting the name to the membership.

Q    So that's why, is that why it states here Mr. Alexander's name was recorded for purposes of the minutes only?

A    Yes.

Q    So just to reflect that somebody had made a nomination for him but that that was not going to be the endorsed candidate --

A    Right.

Q    -- taken to the membership?

A    That's right.

Q    And in the past, you know, you've been the president for almost 40 years, since 1964; right?

Page 55

A    Yes.

Q    -- for president?

A    Yes.

Q    And the, again, I just want to make sure I understand, the procedure is that the executive board takes the nomination, the endorsement to the membership, and then at that meeting, if the members so choose, they can nominate somebody from the floor?

A    Right.

Q    How many elections have there been where you've had, where the position has been contested, the president position?

A    Oh, you know, going back, I don't --

Q    Is it --

A    I really couldn't tell you how many. But let's see. I'm trying to think. Probably the last time that occurred was probably in the mid-'80s I believe is when nominations were made on the floor.

But I'm trying to think if there were other offices that somebody ran for one of the other officers. I mean, I know that it occurred. But I think the last time I can think was, say, in the mid-'80s when a nomination was made from the floor, then we had to go into a full election.

Q    And I know it's a long time to think about,

40 years, but in that time, would you say that there were, you know, one or two times that you've run against someone for the president position or, you know --

A    Oh, no.

Q    -- five to ten times?

A    No.  I won by one vote the first one-year term.  It was just a one-year term.  And then the second election, I think it was two or three votes I won by.  And then -- so I mean, there's been opposition for many years from the very beginning.

And then the membership started changing from one-year terms to two-year terms.  And then I think in the last 30 years, there's probably been three-year terms that's been involved.  So.

There's been a lot of opposition over the years, over the past years, probably nothing similar probably from the mid-'70s on up to this point.

Q    But since the mid-'80s, you were saying there have been no --

A    I don't recall.

Q    -- the office of president has not been contested?

A    Yeah.  I don't recall it being contested.  But it certainly could have been.  Because the nominations are open.  Every three years, that office is,

union members' names, addresses and telephone numbers and the name and address of each shop in Local 527-S.

As I understand it, through a series of events, Mr. Alexander, and he testified and you were present for that, stated that he was ultimately able to obtain mailing labels to mail out campaign literature before the, or around the election; right?

A    Yes.

Q    He was able to obtain --

A    He was able to --

Q    -- mailing addresses and --

A    -- get labels.

Q    Right.

A    But that isn't what I'm addressing right here.

Q    Well, I --

A    He was trying to get a copy of the labels --

Q    I understand.

A    -- deviously that --

Q    I understand.  That wasn't my question.

A    Okay.

Q    And then the other thing he was requesting was the name and address of each shop in Local 527-S. Was he ever given that information?

Page 59

A   He had access to that information just like any other leader had access to it.  There's nothing hid. When I spoke with Mr. Alexander, it became very clear to me that all he was trying to do was get the copy of the labels in whatever way he could get them.

And he certainly wasn't going to make a mailing from the local.  That only came about after I spoke with Mr. Stafford.  He changed his tune then and said, oh, he wanted to come down to the local.

But at no time did he ever mention to me that he wanted to come down to the local and make a mailing.  In fact --

Q   I'm trying to address the issue --

A   -- my secretary had brought it to my attention, he and international, somebody at international had already just about had him a copy of the membership labels without our knowledge.

Q   Mr. Meers, I'm asking you a question as to whether or not, when Mr. Alexander requested the names and addresses of each shop in the local, whether or not he was ever provided with that information.

A   At the -- it was deferred to the December meeting.  And at the December meeting, the only issue that was discussed at that point was the membership mailing from the local office.  He never raised that

question again.  And we was concentrating on giving him the membership access to be mailed from the office.

Q      So he was never provided with a copy of the --

A      He never --

Q      -- name and address of the --

A      -- raised that issue again.

Q      But it is an issue that you state that was raised by him, and I assume you're attempting to try to address in this letter; right?

A      All this was deferred to December the 5th. And he had no problems with the company's -- he didn't raise that issue on December 5th.  He got the labels for the mailing.  And we were trying to get it to him even earlier, and he didn't make himself available.

MR. SLAWSKY:  Off the record for a second.

(Whereupon, a discussion ensued off the record.)

(Whereupon, there was a luncheon recess.)

MR. SLAWSKY:  Did you have a chance to look at these documents?

MS. RHEE:  You know, I didn't.

MR. SLAWSKY:  Well, you can we take a break later.

MS. RHEE:  Okay.

Page 63

the local.  So if there is, I'm not aware of it.

Q    So that has never come into play where the international has said, no, we have certain guidelines, and the local has to follow those?

A    I'm not aware of any.

Q    If you turn to Page 5 of your letter to Mr. Alexander, Item 3 says, the voting was not done by secret ballot.  That was one of Mr. Alexander's complaints about the election; right?

A    Yes.

Q    Now, what did the executive board do to investigate Mr. Alexander's complaint with respect specifically to the secret ballot issue?

A    They reviewed all the information it had pertaining to the voting and how the voting was conducted.  And it was determined that the voting, in fact, had been by secret ballot.

There may have been some members who deliberately waived, showed their ballot to somebody.  But it was never, it was something that was not encouraged, it wasn't done, to encourage the people to do that.

They had an opportunity to receive their ballot.  They, in the Atlanta location, they had a large podium that people could go up.  Or they could go into

Page 65

being blocked.

When I came back in, I was -- someone came to the door and said, Ralph, the polls are getting ready to be closed. Have you voted? And I says, no, I haven't even voted. So I went back in and voted. And Brother Parker asked was anybody else present? Was anybody else to vote? And then we said, no, everybody had voted, so he closed the polls.

And while you didn't ask me this, but on my way walking back, I was getting back out in the hall again, I ran into two people who had claimed to be my supporters and said, sorry we're late. We'd like to vote. I said, the polls are closed. You can't vote. And so they were denied the opportunity. They didn't appeal. But I sent them to Brother Parker, but he had already closed the polls.

Q    The area where the members were picking up their ballots, was there any discussion among the executive board members about where the members were actually casting their votes, how they were filling them out and where?

A    Oh, they, the executive board discussed it with the members who were there from the board of electors. And the board of electors felt that there was no problem at all. They hadn't had no complaint made to

the conference room.  It was left at the discretion of the participants and the members where they wanted to vote and how they wanted to vote.  And as best as the executive board could determine, everything was by secret ballot.

And we had no complaints from the outlying plants.  No member in the outlying plants complained that there was anything that was improper about the way this voting was conducted as it would relate to a ratification of a labor agreement, or even the election of the chairmen in the particular plants.  So based on all we could determine, it was a frivolous charge.

Q    At the Atlanta location where the voting was taking place, you described the area where the members could pick up their ballots.  Were you in the room during the time that the voting was being conducted?

A    No, I was not.  I opened the meeting, turned the meeting over to the chairman of the election committee, Brother James Parker.  He gave each candidate an opportunity to say a few words.  And I said a few words, and I left the meeting.

I noticed that Paul was still in the hall himself, but I got on out.  And we had a traffic jam outside, and it kept me tied up outside getting the traffic straightened out and block -- keeping it from

them that, you know, nobody or anybody was having a problem voting secretly.

Q    Were there partitions or areas in the room where members were casting their vote where they could go behind or out of the way so that, physical divisions in the room where members could go to cast their votes?

A    Yeah.  From where they was getting their ballot, then you had the whole podium up here.  So I think about 40, 30 feet wide across and about ten feet of space up there that you go around, you go around that, and then you go on into the, back around to the tables in the meeting hall, or into the conference room if they wanted to even go in there, but.

Q    Were the members instructed that they could go vote in the conference room?

A    I'm sure that Brother Parker told them, you know, it's a secret vote.  When I got my ballot, well, you know, I knew that I had anyplace I wanted to go in there.  I mean, there was no restrictions to me, so there wouldn't be any restriction to anybody else.

Q    The local owns some partitions, right, that are used in various union activities?

A    It's --

Q    Didn't it?

A    The local doesn't own those.  We've got

Page 67

some sort of floppy partitions that we used when we had the offices downstairs, when there wasn't partitions. But that's the property of the Health and Welfare Trust Fund.

Q    The Health and Welfare Trust Fund, what's that?  What's the relationship between the Health and Welfare Trust Fund and the union?

A    Well, it provides health and welfare benefits for the vast number of the members.

Q    Does the union have access to those partitions?

A    Oh, yeah.  I guess we would have access to them.  But they're not ours.  We don't own them.

Q    But you could have used them if the union had wanted to?

A    Well, if there was a need, we could have appealed to the administrator of the trust fund to use them.  But we saw, the board of electors saw no need to put up additional partitions when we had all this space that was available up there for people to go.

Q    And it was an open space; right?

A    Well, the conference room is not open.  And the podium up there is removed from the area here.  So. And they've got chairs up there, an open area to vote.

Q    It's hard to picture without you actually

describing what it looks like, but am I correct that we're just talking about one big room with some tables and a podium and, you know, a place where voters can walk up and then, you know, they're just all in the same room?

A    And a raised podium where people can walk up, sit up there and vote, come back down, drop the ballot in the box.

Q    And you said that, would it be correct to say that the executive board investigated what went on at other outlying plants on the dates that they voted?

A    Yeah.  The board did, Brother Parker called and I called inquiring what happened in the other locations.

Q    And you called as a member of the executive board, the chairman of the executive board?  In what capacity?

A    Well, as chairman of the executive board, the charge came in.  So it'd go before the executive board.  Brother Parker is chairman of the election committee.  So I would have been really reporting to him anything that I had uncovered to determine if there was anything going on, which I didn't find anything.

Q    And James Parker, he's the, he was the chair of the election committee?

A    Yes.

Page 69

Q    And was that, would you have normally chaired the election committee if you had been running unopposed?

A    If I had been unopposed, I would have chaired it.

Q    And so on this instance, James Parker had to serve as the election committee chairman because you were opposed and there might have been other --

A    He was unopposed.

Q    Right. And in other words, there was, you identified a possible conflict of interest in serving as the election committee chairman because you were in a contested election?

A    I don't know. It was just that I felt more comfortable if someone else was chairing it since I was involved in the election. So Brother Parker conducted that.

Q    And the inquiry that was done at the outlying plants with respect to the secret ballot issue, were there interviews conducted of the membership?

Or I'm trying to figure out what was the, what were the things that the executive board did to inform itself of whether or not there was really substantiation for the charge, for the complaint that voters were not voting in secret at the outlying plants.

Page 71

involved in seeking out information to see whether or not that complaint was substantiated?

A    Yeah.  I was involved in trying to find out if there was any complaints in any other plant.  I think La Grange was one.  Cleveland, Tennessee I think was another area.

Q    And what did you personally do to investigate that complaint?

A    I just asked the leaders had any of the members complained about any of the election activities. And they had no, they said there had been nobody complaining.

Q    And what else did you do besides contact any of the leaders to find out if members had complained?

A    I met with Mr. Alexander at the executive board and tried to get him to explain what his problem was, what it was he said was being violated.  And he was very, you know, close-lipped about it, didn't want to talk about it.

So I mean, we went ahead and did everything we could to determine if there had been anything that occurred that was improper.

Q    So what I'm hearing from you is, when you say we did everything we could, that that activity includes contacting the leaders at the outlying plants to

find out whether members had complained about secret balloting and trying to get information from Paul Alexander.

Would that be an accurate statement?

A    Well, I mean, yeah.  I think that's pretty accurate.  The board members talked amongst themselves if they had anybody complaining to them out of their own plant, and there was no problems.  No one had a problem that we were aware of except Mr. Alexander.

Q    Were there any inquiries into whether, in some of the outlying plants, there had been partitions or other areas set aside so that members could vote in secret or did you not get to that question?

A    No.  We conducted this election the way we conduct all of them.  They are in secret ballot elections.  We didn't have a booth, if that's what you're implying.  We did not have a booth for people to walk into.  We did provide a secret election for the people, though.

Q    Well, maybe that's, maybe you should tell me what you think "secret balloting" means.  How is that requirement satisfied when you conduct an election?

A    When the member is given a ballot, they are told it's a secret vote, please feel free to go anywhere you want to go in the area here, mark your ballot, fold

Page 73

it and bring it back.   That's a secret vote.

Q   So you think as long as you tell the members that, then that's fine?

A   Yeah.

Q   That that constitutes a secret ballot?

A   I mean, we make it as clear as we can, yeah.

Q   Now, as I understand it, at the outlying areas, when the elections were being conducted there, there was somebody in charge of sort of running the elections out there; right?

A   Committee of three.

Q   So can you tell me, for example, at La Grange, was there one or maybe two individuals there who were charged with the responsibility of administering the election?

A   There were three members that conducted the election at every location, at least three members.   In some cases, there may have been more.

Q   And what instructions were given by the executive board, or maybe even the election committee would have been the one directing them as to how to run the election, what instructions were given to those individuals as to how to run the election?

A   There was a letter that was sent with the

Q    And did the local, either the Atlanta local or the offices outside of Atlanta, I'm sorry, the plants outside of Atlanta, did any of those entities send out by mail to the last known address of the members a notice that an election was going to take place?

A    I'm not aware of the local or any entity of the local sending out a notice to the membership at their last known address.  I'm not aware of that.  The only mailing that I'm aware of is the one that Paul Alexander made.

Q    Was that even discussed at the planning meetings for the election, if you know, you know, that this is something that, you know, that this is one way to notify the members of the upcoming election?

A    No.  I don't think it was discussed at the, with the executive board.  Because we had been extremely busy here.  And it was one of those things that probably would have been covered in a newsletter.

But the newsletter kept getting sidestepped, sidestepped.  It wasn't covered in it.  And so, ultimately, the notice didn't go out to every member's address.  But we felt that sufficient notice had been given to every member.

And it wasn't a switched nomination and election date.  Everybody that was a member knew that it

Page 132

MR. SLAWSKY:  Why don't we stipulate, we'll make this Exhibit 39.

(Whereupon, the court reporter marked Exhibit 39 for identification.)

MR. SLAWSKY:  And we'll just stipulate that that is an exhibit that is a true and authentic copy of the letter Paul Alexander sent to the U.S. Department of Labor dated March 11, 2003, in which he said, "I am appealing the decision made by Local 527-S and the international union.

"Enclosed is a copy of the election violations dated November 18, 2002 and a copy of my protest dated December 10, 2002."  It says, "Also enclosed is a copy of my response to the local union's investigation of the election charges and the response from the international union dated February 27, 2003."

FURTHER EXAMINATION

BY MS. RHEE:

Q    How many members were in the local as of the December 8, 2002 election?  Do you know?

A    It was roughly 1,100.

Q    And if you can take a look at Exhibit No. 9.  There it is.  You've got it right there.

A    Oh, okay.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA, ATLANTA DIVISION

ELAINE L. CHAO, SECRETARY )
OF LABOR, UNITED STATES )
DEPARTMENT OF LABOR, )
)
        Plaintiff(s), )
)
   vs )  CIVIL ACTION FILE
)  No. 1:03-CV-2581-CC
LOCAL 527-S, GRAPHIC )
COMMUNICATIONS UNION OF )
THE GRAPHIC COMMUNICATIONS )
INTERNATIONAL UNION, AFL-CIO, )
)
        Defendant(s). )

* * *

The deposition of PAUL ALEXANDER, Deponent, taken on behalf of the Defendant(s), taken for the purposes of examination and under the provisions of the Federal Rules of Civil Procedure; all formalities are waived; the reading and signing of the deposition being reserved; taken before Gaye D. Traynor, Certified Court Reporter, commencing at 9:45 a.m. on this day, Thursday, February 19, 2004, at The Law Offices of JACOBS, SLAWSKY & BARNETT, Attorneys At Law, 100 Peachtree Street, NW, Suite 1950 Equitable Building, Atlanta, Georgia 30303.

* * *

American Court Reporting Company, Inc.

52 Executive Park South, Suite 5201
Atlanta, Georgia  30329

404-892-1331                          800-445-2842

APPEARANCES OF COUNSEL:

For the Plaintiff(s):

MINA RHEE, Assistant U. S. Attorney
    U.S. ATTORNEY'S OFFICE
        NORTHERN DISTRICT OF GEORGIA
    75 Spring Street
    600 U. S. Courthouse
    Atlanta, Georgia 30303
    PH:    404.581.6302
    FAX:   404.581.6234

MILLARD P. DARDEN, JR., Esquire
    U.S. DEPARTMENT OF LABOR
        OFFICE OF THE SOLICITOR
    61 Forsyth Street, SW
    Room 7T10
    Atlanta, Georgia 30303
    PH:    404.562.2067, Ext. 411
    FAX:   404.562.2073
    E-MAIL:  darden-millard@dol.gov

For the Defendant(s):

NORMAN J. SLAWSKY, Esquire
    JACOBS, SLAWSKY & BARNETT
    100 Peachtree Street, NW
    Suite 1950 Equitable Building
    Atlanta, Georgia 30303
    PH:    404.522.4280
    FAX:   404.527.5907
    E-MAIL:  nslawsky@lawofficesatlanta.com

ALSO PRESENT:  Ralph Meers

Thursday at 4:30 p.m., and the regular monthly meeting is on Sunday at 2 p.m.?

A.    Yeah.  Well, that's when I was initially nominated was at the executive board meeting --

Q.    Okay.

A.    -- and I was --

Q.    So Miss -- Miss Ely nominated you at the executive board meeting?

A.    Right.

Q.    Okay.  So you were not present there. Were you present at the membership meeting which was the following Sunday?

A.    Yes.

Q.    Okay, you were.  Were you there when it started?

A.    No, I think I was about ten minutes late.

Q.    Okay.  All right.  And did you make a speech, or did you say anything at that meeting?

A.    No, I requested that nominations be opened back up.

Q.    Why was that?

A.    For people that was arriving late.

Q.    Okay.  Okay.  Why did you want to do that?

A.      Well, because again it didn't specify --

Q.      I'm sorry, put that down because that becomes part of the record.  Okay.  I'm sorry?

A.      Well, then again, like I say, it didn't specify any time.  It just said at the regular membership meeting.

Q.      Yeah.

A.      So, therefore, being that some people was late --

Q.      Okay.

A.      -- I requested that nominations be reopened.

Q.      What was their response to that?

A.      The response was that, no, they couldn't do it.  It's already been closed.

Q.      Okay.  Now, had nominations occurred at the executive board meeting or at that membership meeting?

A.      It occurred at both of them.

Q.      Both of them.  So it was both?  Okay. So it was the first item on the agenda?

A.      The first item pertaining to --

Q.      Was it nominations?  Was that the first item on the agenda of the meeting?

A.      At the executive board?

Q.    Okay.   Why did you write this letter?

A.    Well, I was nominated that Sunday.

Q.    Okay.   So it -- was there a requirement that you had to accept -- that you had to accept the nomination?

A.    Like I say, again being that I wasn't present, I just wanted to verify because I think in the constitution it says that you have to give written notice within five days.

Q.    Okay.

A.    So --

Q.    And who was the person -- were you nominated, you said, by Linda Ely at the executive board?

A.    Yeah.

Q.    Did anyone else nominate you at -- at the meeting -- at the regular monthly meeting?

A.    Yeah.

Q.    Who was that?

A.    One of my coworkers.

Q.    Who was that?

A.    Tim.

Q.    What is his last name?

A.    Newborn.

Q.    Tim Newborn.   Okay.

A.    Newborn.

Q.    N-E-W-B-O-R-N.  All right.  Now, you also have a couple of other items in this letter. You said:  I request that nominations be reopened because the members did not have an adequate time, et cetera?  Why did you put that in there?

A.    Well, then again because we had other nominations that we wanted to make on the floor.

Q.    Who's we?

A.    Well, just different members.

Q.    Okay.  And those were made?

A.    No.

Q.    Okay.  Did anything happen with this request?

A.    Well, they said that they couldn't accept it.

Q.    Okay.

A.    You know, nominations --

Q.    Okay.

A.    -- was closed.

Q.    And then also you have a -- another sentence:  I'm also asking that all current officers of Local 527-S be removed from nominating and election committee."  Why did you put that in there?

A.    Well, I mean to insure a fair election.

I wanted to know who to go through for one thing, you know, and just to keep it fair --

Q.    Uh-huh.

A.    -- and make sure I could receive the same documentation --

Q.    Okay.

A.    -- as other candidates.

Q.    So you wanted to make sure that things were even-handed?

A.    Right.

Q.    Is that correct?

A.    Right.

(Defendant's Exhibit 4 marked for identification.)

BY MR. SLAWSKY:

Q.    Okay.  If you could look at the paper that we marked as Exhibit 4, is that your handwriting?

A.    Yeah.

Q.    Can you read that, look at it?

A.    Yeah. (Witness reviews exhibit.)

Q.    Okay.  What was the purpose of this letter?

A.    Well, like I say, the purpose of this was to get the information I needed to run for

president.

Q.     Okay.  And it's requesting a copy of all union members' names, addresses and phone numbers.

A.     Right.

Q.     The names and addresses of each shop and local.  Why did you want the name and address of each member?

A.     For campaigning purposes.

Q.     Okay.

A.     I mean, we had already discussed being nominated.  This letter was again handwritten, I think, and hand-delivered to the executive board --

Q.     Uh-huh.

A.     -- on the night of the executive board when I was nominated.

Q.     Okay.  But it's dated October 29, 2002?

A.     Yeah.

Q.     And the executive board meeting --

A.     Well, like I say, it was written prior to the executive board.

Q.     Uh-huh.

A.     It was received --

Q.     I gotcha.  Okay.

A.     -- on the executive board night --

Q.     Okay.

Q.    Second of December?  When was the election scheduled?

A.    The 8th.

Q.    Eighth.  So this is six days before the election?

A.    Yeah.

Q.    Okay.  And do you know when you -- when the papers, those letters, were actually mailed?

A.    They was mailed the same day.

Q.    They were.  So December 2nd?

A.    Okay.

Q.    Did you physically mail them yourself or --

A.    Yeah.

Q.    -- did someone else mail them for you?

A.    Yeah.

Q.    So you took them to the post office?

A.    Yeah, accompanied by someone from the union.

Q.    Okay.  All right.  Who accompanied you?

A.    Tom Jolly.

Q.    Tom Jolly.  Who is Tom Jolly?

A.    Tom Jolly was on the general board and also the executive.

Q.    Sorry?  General board of the

international union?

A.    International, right.  So the union had to have somebody present while we put the envelopes and everything.

Q.    So Mr. Jolly was the one who accompanied -- who watched you do that and then accompanied you to the post office?

A.    Right.

Q.    Okay.  And then you delivered all the letters at one time to the post office?

A.    Right.

Q.    And that was again before the election?

A.    Right, no, then again I can't say that.

Q.    Tell me what you mean.

A.    Because we never knew when the elections took place out of state.  And after the fact we come to find out those elections had already taken place --

Q.    Uh-huh.

A.    -- prior to December 2nd.

Q.    What about the election that was supposed to occur in the Atlanta area?

A.    Well, that would be December 8th --

Q.    Okay.

A.    -- which would have been that Sunday.

Q.      Okay.  And were most of the -- were there more union members in the Atlanta area than elsewhere?

A.      Well, then again I don't know because I never got a record.

Q.      Okay.  All right.  So you're saying that it may have been before the election in Atlanta, but you were unsure about whether it was before the election in other places?

A.      Right.  The only thing I know is when I called to let Mr. Meers know that I wanted to be present at the other polling sites, he replied that they'd already taken place.

Q.      Okay.  All right.  And why did the mailing take place on that date on December 2nd?

A.      Well, I called the Labor Department, and apparently Chuck Logan had got Mr. Stafford or somebody.

Q.      Who's -- who's Chuck Logan?  You need to tell us who those people are.

A.      Well, that's the Department of Labor.  He's over the Department of Labor, Office of Labor Management Standards.  And someone had called and talked to Ralph about getting me those labels, that I had a right to those mailing labels.

So I get out there talking to Ralph. Then Ralph had got back in touch with me and said, yeah, I could come down and mail them from down there which was, I guess, during the week of Thanksgiving.

Q.    Okay.

A.    So for two days there we was.  I guess the union was closed anyway.  So I think the following --

Q.    So this was immediately --

A.    December 2nd was actually the week following the Thanksgiving holidays.

Q.    Okay.  All right.

        (Defendant's Exhibit 7 marked for identification.)

A.    (No response.)

BY MR. SLAWSKY:

Q.    Let's look at the papers that were marked Exhibit 7.  It says on top of the first one: Meeting December 2, 2002, at 10 a.m., and there's signatures.  Looks like Ralph Meers' signature, then your signature and some others.  What kind of meeting was this?

A.    Well, this was to mail out the fliers.

Q.    Okay.  All right.  So this was actually when the mailing occurred?

Q.      Okay.  Turn over to page 4.  Now, paragraph 8 refers to your November 18, 2002, letter?

A.      Uh-huh.

Q.      That is Exhibit 6.

A.      Uh-huh.

Q.      Now, in that November 18 letter you requested names and addresses of all union members and all names and addresses of all shops and local unions.  And you wanted to have the nominations reopened and that current officers of Local 527-S be removed from the nomination and election committee.  That was what you said in that letter.

A.      Uh-huh.

Q.      Okay?  Did paragraph 8 address that issue?

A.      Yeah.

Q.      Okay.

A.      Uh-huh.

Q.      You don't agree with what's stated in paragraph 8, do you?

A.      No.

Q.      Okay.  All right.  Let's flip over to page 5.  Paragraph 8, by the way, keeps on going essentially pretty long.

MS. RHEE:  Do you need more time to read

court or other agency outside the international for redress till all forms of relief and avenues of appeal is provided under this constitution have been exhausted.

Do you reading this -- have you ever read this paragraph before today?

A.    I haven't read too much of anything in this book --

Q.    Okay.

A.    -- other than just flipping through it.

Q.    Okay.  Do you think that you've exhausted all of the --

A.    Yeah.

Q.    -- all the remedies that may have been available for relief or avenues of appeal in the union before you filed your charges with the U.S. Department of Labor?

A.    Yeah.

Q.    Okay.  And tell me why you think that.

A.    Like I say, I appealed to the local and the international.  After doing all that, I even sent a memo to the local asking them for additional help, if there was anything I needed to do.  I never did get a response.

Q.    And at that time you had not asked for a

this case?

A.    Yeah.  And like I say, as far as the information I had, I just sent them -- the international a copy and also sent Ralph copies.

Q.    All right.  Did anyone stop you or -- from getting anything -- more information which you wanted with regard to your complaints or appeals?

A.    Well, I mean, I requested information from the local that I never did get.

Q.    What about from the international union?  Did anyone stop you there?

A.    No, I mean, they told me I had the right to appeal the decision --

Q.    Sure.

A.    -- and that's what I done so I pretty much was going --

Q.    Sure.

A.    -- on by the memos that they was sending me.

Q.    Okay.  Did you -- did anyone give you the wrong information?

A.    I don't know.  I mean, I don't know if they gave me the wrong information or the right information.

Q.    Okay.  Well, based on what you may have